[No. 18819-1-III.   Division Three.   December 14, 2000.]

WALLIS D. HUBBARD, *Appellant*, v. SPOKANE COUNTY, ET AL., *Respondents*.

*William J. Powell* (of *Powell, Kuznetz & Parker*), for appellant.

*Hugh T. Lackie* and *Amy C. Clemmons* (of *Evans, Craven & Lackie, P.S.*), for respondents.

BROWN, A.C.J. — Wallis D. Hubbard's complaint for wrongful discharge in violation of public policy against Spokane County was dismissed at summary judgment. Because he fails to establish the necessary clarity and jeopardy elements of his tort claim, we affirm.

## FACTS

Mr. Hubbard was the Spokane County Planning Director for 15 of the 17 years he worked with the department. Part of Mr. Hubbard's responsibility was to administer and interpret land-use statutes and ordinances. Until May 1995, planning was a separate division of the Public Works Department. Dennis Scott was the Director of Public Works and Mr. Hubbard's supervisor. The building division of public works, directed by James Manson, reviewed building permit applications. Mr. Manson also worked for Mr. Scott.

On May 26, 1995, the planning and building divisions were consolidated with Mr. Manson as the director. Following consolidation, Mr. Scott and County Commissioners Phil Harris and Steve Hasson told Mr. Hubbard he still had a job in planning. On June 9, 1995, Mr. Manson fired Mr. Hubbard, an at-will employee.

Mr. Hubbard filed suit against Spokane County, Commissioners Steve Hasson and Phil Harris, and his supervisor, James Manson, alleging wrongful discharge violating public policy. Mr. Hubbard's complaint was dismissed at summary judgment. Mr. Hubbard's appeal centers on his view that the court's dismissal was contrary to the following evidence, which we describe in a light most favorable to Mr. Hubbard.

In October 1994, a property owner wanted a permit for two residences on one lot. The property was not zoned for this use, so Francine Shaw, a planner working under Mr. Hubbard, suggested a short plat. Instead, the property owner returned with Commissioner Hasson who suggested to Ms. Shaw that the two residences could be connected by a 64-foot breezeway and characterized as a duplex, an allowed use. Ms. Shaw indicated that she was uncomfortable with this creative approach and would need to talk to her boss. Steven Horobiowski, who was in charge of current planning, rejected the duplex permit because it did not meet the "spirit and intent of the regulation." However, Gary Fergen, the Assistant Director of Planning, approved the permit after discussions with Commissioner Hasson. Mr. Hubbard was not involved in this permit application. In his deposition, he described the duplex characterization as a "creative approach" to land use controls, but "probably not technically illegal." Mr. Hubbard was not asked to do "anything illegal or inappropriate with respect to the breezeway by any superior."

In the fall of 1994, the developer of the Spokane Valley Mall requested a permit to expand the project. Commissioner Hasson asked Mr. Hubbard to approve the requested increase, but Mr. Hubbard limited approval to an increase to 715,000 square feet, the maximum increase allowed by the zoning ordinance. Commissioner Hasson wrote the developer, indicating that he would "advocate" an expansion to 815,000 square feet, but did not indicate that he would do so by circumventing the zoning procedures. Mr.

Hubbard is not aware of anyone in planning "being asked to sign off on anything that was illegal with respect to the Valley Mall when [he] was there." Additionally, Mr. Hubbard alleges that Commissioner Hasson directed him to approve a time extension for the Spokane Valley Mall developer without circulating the extension request to all "affected agencies and departments" as required by ordinance. Mr. Hubbard indicates that he approved the extension "under protest."

In December 1994, a grocery store wanted to add 700 square feet and remodel an existing nonconforming use. Commissioner Hasson wrote a memo to Mr. Hubbard stating that the remodel constituted "upkeep, repair, and maintenance of nonconforming buildings," and therefore did not require a building permit under the zoning code. Mr. Hubbard disagreed with Commissioner Hasson's interpretation, but considered the memo a directive and approved the permit without requiring a hearing.

In January 1995, a builder submitted a permit application for a 14-foot retaining wall. According to Mr. Hubbard, the zoning code is not clear on retaining walls, but the planning department, including Mr. Hubbard, considered the wall a "fence." Fences in residential neighborhoods over 6 feet high required a variance, which included notice and a hearing. Mr. Hubbard approved a 6-foot retaining wall. Mr. Hubbard found out later that Commissioner Hasson overrode the 6-foot permit and approved a 14-foot retaining wall. Mr. Hubbard points out that the decision to grant a variance is made by a zoning adjuster or hearing examiner, which can then be appealed to the board of adjustments and then the superior court; county commissioners do not review variance requests.

In February 1995, Mr. Hubbard presented testimony to the Boundary Review Board on behalf of the planning department. Apparently, Mr. Hubbard's testimony conflicted with Commissioner Hasson's testimony, and Commissioner Hasson wrote Mr. Hubbard a stern memo requesting that Mr. Hubbard change his position.

On May 30, 1995, shortly after the building and planning divisions were consolidated, Mr. Manson conducted a staff meeting with Mr. Hubbard present. Mr. Hubbard disagreed with Mr. Manson's interpretation of the zoning code, and a few days later presented Mr. Manson with several statutes and ordinances to rebut Mr. Manson's interpretation. Mr. Manson ended the discussion by advising Mr. Hubbard that he was no longer needed at the public works staff meetings. On May 31, 1995, Mr. Manson held another public works staff meeting without Mr. Hubbard present. According to Mr. Hubbard, Mr. Manson directed the staff to bend the rules whenever possible and indicated that it was okay to go a little faster than the speed limit.

On June 4, 1995, Mr. Manson, Mr. Hubbard, Mr. Fergen, and Mr. Horobiowski met with John Morrison, the airport director, to consider an application to construct a new motel at the Spokane International Airport. The interpretation of the zoning code for this purpose had been in dispute for several years. Mr. Hubbard, Mr. Fergen, and Mr. Horobiowski interpreted the county zoning code to prohibit the described motel. Mr. Manson disagreed and indicated that he would issue the building permit. Mr. Hubbard became somewhat "confrontational" with Mr. Manson. After the meeting, Mr. Hubbard consulted with James Emacio, the Senior Civil Deputy Prosecuting Attorney, about Mr. Manson's intention. Mr. Emacio agreed with Mr. Hubbard's interpretation and communicated his concern to Mr. Manson by telephone. Mr. Emacio followed up this conversation with a June 9, 1995 letter (copied to Mr. Manson) to the motel's attorney advising his belief that Mr. Manson's interpretation of the zoning code would not sustain a legal challenge. That same day, Mr. Manson fired Mr. Hubbard.

## ANALYSIS

The issue is whether the trial court erred by granting summary judgment dismissal of Mr. Hubbard's complaint

when deciding no material facts remained and concluding Mr. Hubbard failed to state a legally viable claim for discharge in violation of public policy.

■ On appeal, summary judgments are reviewed de novo. RAP 9.12; *Smith v. Bates Technical Coll.*, 139 Wn.2d 793, 800, 991 P.2d 1135 (2000). The County, as the moving party, has the initial burden of showing no material fact issues remain. *Young v. Key Pharms., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989). As the defendant, the County meets this burden by showing an absence of evidence to support an element of the nonmoving party's case. *Id.* If the County meets its burden, then the inquiry shifts to Mr. Hubbard, who has the ultimate burden at trial. *Id.* If Mr. Hubbard fails to submit evidence sufficient to establish the existence of an essential element to his claim, then summary judgment is appropriate. *Id.* The evidence submitted by both parties, along with all reasonable inferences therefrom, are viewed in a light most favorable to Mr. Hubbard. *Smith*, 139 Wn.2d at 800.

■ Preliminarily, we note the trial court entered findings of fact. Because of the de novo nature of summary judgment, the findings are superfluous and not considered here. *See Duckworth v. City of Bonney Lake*, 91 Wn.2d 19, 21-22, 586 P.2d 860 (1978). Conclusions of law based upon disputed findings are equally superfluous. *Id.* Under our standard of review, we consider the material facts bearing on the critical legal issues no longer in dispute. First, under the standard of review we accept those facts established by Mr. Hubbard together with all reasonable inferences as the material facts of this case. Second, the County does not dispute those facts bearing on the dispositive legal issues and establishes facts not disputed by Mr. Hubbard.

■ Absent a contract or narrow exception, the general rule in Washington is that an employer or employee can terminate employment at will. *Selix v. Boeing Co.*, 82 Wn. App. 736, 740, 919 P.2d 620 (1996). Consequently, an employer generally can discharge an employee for no cause, or even for a morally wrong cause, without fear of liability.

*Sedlacek v. Hillis*, 104 Wn. App. 1, 3 P.3d 767, 773 (2000) (citing *Bakotich v. Swanson*, 91 Wn. App. 311, 314-15, 957 P.2d 275 (1998)). One narrow public policy exception to the at-will rule is the tort of wrongful discharge. *Wilmot v. Kaiser Aluminum & Chem. Corp.*, 118 Wn.2d 46, 53, 821 P.2d 18 (1991) (citing *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 232, 685 P.2d 1081 (1984)). This exception protects employees whose discharge contravenes a clear mandate of public policy. *Thompson*, 102 Wn.2d at 232.

■ A plaintiff must plead and prove four elements under the public policy exception: (1) the existence of a clear public policy (clarity); (2) that discouraging the plaintiff's conduct would jeopardize the public policy (jeopardy); (3) the linkage between the public-policy-linked conduct and the dismissal (causation); and (4) absence of an overriding justification for the dismissal (no justification). *Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931, 941, 913 P.2d 377 (1996).

■ The public policy must be judicially or legislatively created. *Thompson*, 102 Wn.2d at 232. The court must be careful to "find" public policy, not "create" it. *Sedlacek*, 104 Wn. App. at 18. Courts have generally recognized public policy violations in four types of termination situations: (1) refusing to commit an illegal act; (2) performing a public duty or obligation; (3) exercising a legal right; or (4) reporting employer misconduct. *Gardner*, 128 Wn.2d at 936.

Mr. Hubbard contends Mr. Manson and Commissioner Hasson terminated him for refusing to violate the zoning laws or, in the alternative, for protesting the violation of the zoning laws. He argues that by violating these zoning laws, Mr. Manson and Commissioner Hasson were affording special privileges to developers and thus breaching the Municipal Officer's Code of Ethics under chapter 42.23 RCW.

■ Whether the Municipal Officer's Code of Ethics contains a clear mandate of public policy is a question of law. *Roberts v. Dudley*, 140 Wn.2d 58, 65, 993 P.2d 901 (2000);

*Dicomes v. State*, 113 Wn.2d 612, 617, 782 P.2d 1002 (1989). Mr. Hubbard carries the burden of establishing the public policy's existence. *Gardner*, 128 Wn.2d at 941. The relevant portion of the Municipal Officer's Code of Ethics prohibits a municipal officer from using "his or her position to secure special privileges or exemptions for himself, herself, or others." RCW 42.23.070(1). Commissioner Hasson and Mr. Manson qualify as municipal officers under RCW 42.23-.020(1) and (2).

Assuming chapter 42.23 RCW contains a mandate of public policy, the statute does not apply to the facts of this case. The Code proscribes beneficial contractual interests on the part of municipal officers made by, through, or under the officer's supervision. RCW 42.23.030. None are alleged or part of this record. The purpose of the Code is to increase the pool of citizens eligible for public office by allowing certain remote interests. RCW 42.23.010. The kind of beneficial interest appears limited to financial interests. *See Barry v. Johns*, 82 Wn. App. 865, 868, 920 P.2d 222 (1996). Mr. Hubbard completely fails to establish any inference that the individual respondents received beneficial financial interests from County contracts. Accordingly, he fails to establish the clarity element. At best, Mr. Hubbard infers Commissioner Hasson and Mr. Manson were seeking to accommodate political constituents, an outcome not proscribed by chapter 42.23 RCW. Mr. Hubbard argues no other public policy violations. Although our discussion could end here, some discussion of the remaining elements is warranted.

Mr. Hubbard's allegations do not satisfy the jeopardy element. For instance, Mr. Hubbard disagreed with the resolution reached on the breezeway permit, but he was not directly involved in the permit's issuance, and he does not allege that he communicated his objection to anyone. *See Havens v. C&D Plastics, Inc.*, 124 Wn.2d 158, 178, 876 P.2d 435 (1994) (summary judgment was proper where plaintiff failed to show he communicated his opposition to the alleged violations, and he never personally refused to

implement a company program violating public policy). Mr. Hubbard failed to explain how his personal protest of the permit for the grocery store remodel jeopardizes the public policy he claims is at stake. Mr. Hubbard does not explain how discouraging his opposition to the airport motel would jeopardize any public policy when normal hearing procedures remained available. Mr. Hubbard has failed to show that other means of policing the zoning laws are inadequate. *Gardner*, 128 Wn.2d at 945. Further, any interpretation of a zoning law is likely to "favor" some property owners and "disfavor" other property owners. The contradicting interpretations are merely opinions in the context of Mr. Hubbard's allegations and, as such, are gray areas. *See Dicomes*, 113 Wn.2d at 624 (discretionary political decisions too tenuous).

The causation element generally is a question of fact. *See Sedlacek*, 104 Wn. App. at 23. Here, viewing the evidence of the timing of his discharge favorably to Mr. Hubbard, we assume a material fact issue exists as to whether the County discharged Mr. Hubbard for his objection to the airport motel issue.

Under the *Thompson* burden shifting process, if the employee does not establish the clarity or jeopardy elements, the employer has no burden to prove the dismissal was for legitimate cause. *Thompson*, 102 Wn.2d at 232-33. In view of the burden shifting requirements and our above conclusions, the respondents have no burden to discuss justification for Mr. Hubbard's at-will discharge. Therefore, no discussion of the justification element is merited.

## CONCLUSION

We hold the trial court did not err when granting summary judgment dismissal of Mr. Hubbard's complaint for wrongful discharge in violation of public policy. Mr. Hubbard failed to show a violation of a clear mandate of public policy. Even assuming a clear mandate was shown, he has failed to show that protecting his conduct is required

to promote the public policy he alleges was violated.

Affirmed.

SWEENEY and SCHULTHEIS, JJ., concur.

Reconsideration denied March 9, 2001.

Review granted at 144 Wn.2d 1009 (2001).